VIRGINIA IRON, COAL & COKE CO. v. WEBB et al.

(Circuit Court of Appeals, Sixth Circuit.    March 2, 1920.)

No. 3259.

1. DEEDS ⟂124(3)—HABENDUM CLAUSE HELD NOT TO CHANGE ESTATE FROM FEE TO LIFE INTEREST.

   A deed to land in Kentucky, in which both the granting and warranty clauses purported to convey an estate in fee, *held* to convey the fee, although the habendum clause was to the grantee during his natural life, and at his death to be equally divided among his heirs, on the ground that the intention was that the heirs should take by descent, and not by purchase.

2. VENDOR AND PURCHASER ⟂232(1)—GRANTEE OF MINERALS CHARGED WITH NOTICE OF RIGHTS OF OCCUPANTS OF LAND.

   A grantee of mineral lands *held* charged with constructive notice of the rights of other persons then in possession of and living on the land, claiming under deeds without mineral reservations, which were recorded, to the extent of the boundaries described in such deeds.

3. ESTOPPEL ⟂70(1)—FACTS INSUFFICIENT TO CREATE.

   A finding by the trial court that owners of land then in possession were not estopped, by standing by without claiming title, to deny the effectiveness of a conveyance by others of the mineral rights therein, affirmed.

Appeal from the District Court of the United States for the Eastern District of Kentucky; Andrew M. J. Cochran, Judge.

Suit by the Virginia Iron, Coal & Coke Company against Alexander S. Webb, Jr., and G. Beekman Hoppin. Decree for defendants, and complainant appeals. Affirmed.

J. C. Jones, of Frankfort, Ky., for appellant.

B. C. Tynes, of Huntington, W. Va., and John F. Hager, of Ashland, Ky., for appellees.

Before KNAPPEN, DENISON, and WARRINGTON, Circuit Judges.

KNAPPEN, Circuit Judge. The appellant brought suit to quiet title to the minerals underlying certain parcels of land in Perry county, Ky., on Big creek, which is a tributary of the North fork of the Kentucky river. Upon hearing on pleadings and proofs, the District Judge found in favor of defendants and dismissed the suit. This appeal is from that order of dismissal.

The situation, so far as presently material, is this:

In 1823, Robert Williams obtained a patent for 50 acres on Big creek, and in 1825 a patent for another 50 acres on the same creek. In 1843, Henry C. Duff obtained a patent for 100 acres, which included and surrounded both Williams' parcels. Within the Duff and Williams tracts there empty into Big creek (which runs in a generally northwesterly direction) the following tributaries (from above down): Buffalo fork from the east, Jack's branch from the west, Jenny's (or Alfred Eversole) branch from the east, Orchard branch also from the east, Riles' branch from the west, Ben's branch from the east, and

Wolf Pen branch from the west. · The southern line of the Duff parcel extends a short distance above (southeasterly from) the mouth of Buffalo fork, and a considerable distance below (northwesterly from) the Wolf Pen branch. In 1846, Jackson G. Combs obtained patent for 3,500 acres on Brown's fork, which is a tributary of Big creek, and joins the latter a considerable distance below the mouth of Wolf Pen branch. This patent really contained 4,728 acres. Its western boundary crosses Big creek slightly east of the westerly end of the Duff tract; its southeastern boundary also crosses that creek above Buffalo fork, and extends beyond the ridge between Big creek and the North fork of the Kentucky river. About one-half of it lies on Big creek; the bulk of the remainder on Brown's fork. The Williams and Duff tracts lie within the Combs tract; but the latter is junior and inferior to both the Duff and Williams patents. Combs also obtained another patent for 2,500 acres on the North fork of the Kentucky river, overlapping the easterly part of Combs' other patent; but the boundaries of the 2,500-acre tract are not important.

In 1857, Woolery G. Eversole, who had acquired the Duff and both Williams parcels, obtained a patent for a tract described as containing 1,500 acres, surrounding and including all three of the parcels last referred to. This survey was doubtless believed to cover all the land on Big creek, both at its lower end and between the tops of the ridges on either side. It actually contained more than 4,000 acres. It included all of the tributaries of Big creek entering it from the west, the entire of Ben's branch and Orchard branch, and the lower parts only of Buffalo fork and Jenny's branch; also at least two branches farther down the creek and one farther up. The Woolery G. Eversole title was thus inferior to the Combs title as to so much of the land east of the western line of the Combs tract as was outside the Duff and Williams patents.

July 6, 1870, Woolery G. Eversole conveyed to William Baker, by warranty deed, a parcel covering the entire watershed of Jack's branch. Baker thereby obtained title to so much of the description as adjoined Big creek within the Duff and the upper Williams patents, and also to so much as lay southeast of the southern line of the Combs 3,500-acre patent and on the head of Jack's branch.

On February 5, 1878, Woolery G. Eversole conveyed to his son Alfred (likewise by warranty deed) a parcel stated to contain 500 acres, more or less, bordering on its westerly side the Baker parcel and covering the entire watershed of Jenny's fork and all of Big creek *below* (speaking generally and accurately enough for present purposes, at least) Slick Rock ford, so called, which was about halfway between the mouths of Jenny's and Buffalo forks, to the mouth of Orchard branch. So much of this as lay directly on Big creek was within the Williams and Duff patents.

On the same day (February 5, 1878) Woolery G. Eversole, by warranty deed, conveyed to his son Thomas a parcel stated to contain 500 acres, more or less (adjoining on the south the parcel so conveyed to Alfred), and covering the entire watershed of Buffalo fork and all of Big creek *above* a line drawn through Slick Rock ford, and between

it and the mouth of Buffalo fork. So much of this parcel as lay directly on Big creek was within the limits of the Duff patent.

The parcels so conveyed, respectively, to Baker, Alfred Eversole, and Thomas Eversole adjoined each other on Big creek. The portions of each of these parcels not within the Williams and Duff patents were within the overlap of the Combs patent.

August 31, 1883, Josiah H. Combs, who had succeeded to the title of Jackson G. Combs, gave to Woolery G. Eversole, Alfred Eversole, and Thomas Eversole a title bond, evidently intended to cover all the lands to which Combs claimed title, and which had been conveyed by Woolery G. Eversole to his sons Alfred and Thomas, respectively, subject to a vendor's lien for $500.[1] The record would indicate that it was not until after the conveyances from Woolery G. Eversole to his sons (and thus long after the conveyance to Baker) that any of the parties concerned had information that the lands in question were embraced within the Combs patent, the survey whereof had been run by calls only. Combs' title was doubtless bought to perfect the title to the lands so conveyed by Woolery G. Eversole.

April 5, 1887, Thomas Eversole conveyed to William Newberry all the land conveyed to Thomas by his father, so far as involved here; and on the same date Combs likewise made conveyance to Newberry of the same land. On September 3, 1887, Newberry gave to one Horsley a title bond or option of the mineral rights in the parcel of land he had so acquired from Thomas Eversole and Combs; and on April 30, 1890, Newberry and Thomas Eversole conveyed to Arthur D. Bright, trustee, the minerals under the Newberry parcel, said to contain 296.25 acres.

On June 18, 1887, Alfred Eversole gave to Horsley a title bond for the mineral rights in the parcel of land so conveyed to him by Woolery G. Eversole and sold to him by Combs under the title bond referred to. September 30, 1889, Combs conveyed to Alfred Eversole all the land owned by the former within the boundary conveyed to Alfred by his father. On January 27, 1890, Alfred Eversole conveyed to William Cornet a parcel containing 167 acres, being the easterly part of the Alfred Eversole tract. On March 28, 1890, Alfred Eversole conveyed to Arthur D. Bright, trustee, the mineral rights in all the lands conveyed to him by Woolery G. Eversole, except that conveyed, as already stated, by Alfred to Cornet (said to embrace 321.25 acres), so far as involved here; and on April 1, 1890, Cornet and wife conveyed to Arthur D. Bright, trustee, the mineral rights in the land so conveyed to Cornet by Alfred Eversole.

The defendants, Webb and Hoppin, claim title under Bright, trustee; and if the conveyances from Woolery G. Eversole to Thomas and Alfred, respectively, were in fee, defendants have acquired, as against both the Eversoles and Combs, both the legal and equitable title to the minerals in question, unless the defense of estoppel, hereafter discussed, is sustained.

---

[1] Lands conveyed by Woolery G. Eversole to a son, Preston, were also included in the title bond.

On July 21, 1887, however, Josiah H. Combs joined with William Baker in a conveyance to T. P. Trigg, trustee, of the mineral lands underlying certain parcels of land which plaintiff (who is the grantee of Trigg, trustee) claims include all of the Alfred Eversole parcel and all of the Thomas Eversole parcel except the small part which is within the older Williams and Duff patents, and that these conveyances to Trigg, trustee, carried, for reasons hereafter to be stated, a title superior to that obtained by Bright, trustee, derived through Thomas and Alfred Eversole and their grantees.

The decision of this case turns upon the question which of these two trustees, Bright or Trigg, obtained, as against the other, the superior title to the minerals involved.

[1] 1. Plaintiff contends that the deeds from Woolery G. Eversole conveyed a life estate merely to Thomas and Alfred, respectively. This question is not specially important, except as it affects the title to so much of the lands as are within the Duff or earlier patents, or perhaps as it may affect the question of adverse possession. In the Alfred Eversole deed the conveyance in the granting clause is to him, "his heirs and assigns"; the habendum is to him during the term of his natural life, and at his death to be equally divided among his heirs; the grantor "forever warrants and defends" the premises "unto Alfred Eversole, his heirs and assigns." The deed to Thomas differs only in that in the warranty clause the words "and assigns" are omitted. Counsel treat the deeds as identical in effect, and we think rightly.

At the common law a conveyance otherwise of a fee was not limited by repugnant language in the habendum clause. Section 2342 of Carroll's Kentucky Statutes provides that, unless a different purpose appears by express language or necessary inference, every estate in land created by deed, without words of inheritance, shall be deemed a fee simple, or such other estate as the grantor had power to dispose of. Section 2345, however, provides that if an estate be given by deed to any person for his life, and after his death to his heirs, or the heirs of his body, or his issue or descendants, the same shall be construed to be an estate for life only in such person, and the remainder in fee simple in his heirs, or the heirs of his body, or his issue or descendants. The Kentucky courts recognize the rule that a deed is to be construed against the grantor rather than the grantee (Ky. Diamond Co. v. Ky. Transvaal Co., 141 Ky. 97, 132 S. W. 397, Ann. Cas. 1912C, 417); also that a conveyance in fee is not overturned by a subsequent proviso (Ratliffe v. Marrs, 87 Ky. 26, 7 S. W. 395, 8 S. W. 876); also that, when the habendum clause is in conflict with the granting words of the deed, the latter must control (Henderson v. Mack, 82 Ky. 379); but that, in construing a deed, all parts of the instrument must be considered together, and, if upon such consideration an intention appears to vest a less estate than a fee, that intention will be carried into effect (Harkness v. Meade, 148 Ky. 565, 147 S. W. 10; Woodward v. Thissell [C. C. A. 6] 218 Fed. 810, 134 C. C. A. 498); that technical words in the granting (and even in the habendum) clause importing a fee must yield to a clause expressly limiting the interest of the grantee to a life estate (Atkins v. Baker, 112 Ky. 877, 66 S. W. 1023; Wilson

v. Moore, 146 Ky. 679, 143 S. W. 431; Henderson v. Mack, supra; Dinger v. Lucken, 143 Ky. 850, 137 S. W. 776). The question is: Which of these rules dominates the instant case?

It is noticeable that both the granting and warranty clauses purport to convey an estate in fee; also that the habendum clause, including the words "during the term of his life," merely states the disposition that would be made of the property, had the grantee died without having disposed of it; and the meritorious question thus is whether the intention was that the grantee's heirs should take by descent or by purchase.

In our opinion the more natural inference is, from the deed taken as a whole, that the grantor intended to pass an estate in fee, having in mind that both the granting and warranty clauses purport to convey a fee, that the habendum clause is less explicit than in the deeds held in the cases above cited to convey an estate for life, that the grantors were presumably not familiar with the distinction between words of inheritance and words of purchase, and the practical construction given to the deeds by the parties (Bain v. Tye, 160 Ky. 408, 169 S. W. 843), and until plaintiff raised the question in the instant suit after the death of Woolery G. Eversole, 35 years after his conveyances to Alfred and Thomas, 26 years after the conveyance from Baker and Combs to Trigg, trustee, and 23 years after the conveyance to Bright, trustee, from Alfred Eversole and Cornet and from Newberry. The Court of Appeals of Kentucky has reached a like conclusion in a number of cases where the words of limitation were much stronger than those contained in the habendum clause in the deeds here in question. Ray v. Spears, 65 S. W. 867; Cox v. Anderson's Adm'r, 69 S. W. 953; Barth v. Barth, 38 S. W. 511. And see Humphrey v. Potter, 70 S. W. 1062, 24 Ky. Law. Rep. 1264, where it was held that a deed in which there was no limitation in the granting clause, which conveyed to one, to have and to hold to his heirs and assigns forever, conveyed a fee, despite the addition of the words, "and after the death of the said second part the land hereby conveyed shall go to the children of [the grantee] by his first wife."

2. Plaintiff contends that the deed from Baker and Combs to Trigg, trustee, of July 21, 1887, was intended to convey, and was in terms sufficient to identify, the minerals underlying the parcels already referred to as belonging to Alfred Eversole, William Cornet, Thomas Eversole, and William Newberry, viz. the minerals subsequently conveyed to Bright, trustee; that Trigg, trustee, purchased the minerals in question under that conveyance in good faith and without notice or knowledge of any adverse claims thereto; that Thomas Eversole and Alfred Eversole, with knowledge that Baker and Combs were selling the mineral rights in question under claim of title thereto actually stood by without asserting title in themselves or giving Trigg, trustee, any notice thereof, and are thereby estopped from afterwards asserting title. Plaintiff in fact specifically contends that Alfred Eversole was present when Combs made the deed conveying the minerals to Trigg, trustee; that he not only did not object, but consented to it, and obtained the

full benefit of the sale by having the purchase price applied on his purchase-money debt owing to Combs on the same land.

The trial judge, upon elaborate consideration of the record, concluded that the deed from Combs and Baker to Trigg, trustee, did not cover the mineral rights in question, and was not so intended by the grantors; that the alleged estoppel against Thomas and Alfred Eversole was not proven, and that even an estoppel against Thomas Eversole would not avail as against Newberry, his earlier grantee; that both Alfred Eversole and William Newberry were in actual possession of their respective parcels when the deed to Trigg, trustee, was made; and that the latter was chargeable with notice of their rights.

3. The deed from Baker and Combs to Trigg, trustee, of July 21, 1887, purports to convey the minerals under a tract of 1,800 acres, 1,000 of which is identified as "deeded from Woolery G. Eversole to W. M. Baker." This doubtless relates to the conveyance earlier referred to herein, and which may have contained the acreage stated. The Baker tract would not include the minerals here in question. If embraced within the Baker and Combs deed, it must be because underlying the 800 acres apparently claimed by Combs as a part of the overlap of the 3,500-acre tract. The District Judge thought that an intent to cover the minerals here in question was inconsistent, not only with the language of the conveyance itself, but with the fact of the previous conveyances by both Baker and Combs. The 800 acres are described only as "deed from Ira Davidson, commissioner, to J. H. Combs." There is competent evidence that it would be impossible to locate the alleged Combs 800 acres on the ground. Unless Alfred and Thomas Eversole acquiesced and participated in Combs' conveyance to Trigg, trustee, that conveyance is entirely inconsistent with Combs' title bond of August 31, 1883, to Woolery G., Alfred, and Thomas Eversole, and with Combs' conveyance to Newberry of April 5, 1887, which antedated the Baker and Combs deed to Trigg. It was also entirely inconsistent with Combs' conveyance of September 30, 1889, to Alfred Eversole, unless, as does not appear on the face of the deed, that conveyance was of the surface only. Baker had also made conveyance of a portion of the land obtained by him from Woolery G. Eversole. We are disposed to think that the record sustains the conclusion of the trial judge that the deed was not intended to convey the minerals here in question; but we do not find it necessary to rest our ultimate conclusion on this point.

[2] 4. In our opinion the public record furnished constructive notice of the deeds from Woolery G. Eversole to Alfred and Thomas, respectively, as of February 5, 1878. The then county clerk testifies that he drafted the body of one deed and part of the other, that both were executed before him at the time purported in the deeds and acknowledgments, and that he thinks both acknowledgments were taken before him as county clerk. While the full certificate of the acknowledgment and of record does not appear to have been signed, there is indorsed on the back of each deed a memorandum, signed in the name of the then county clerk, containing the fact of acknowledgment, of lodging for record, and actual record on February 5, 1878, with ref-

erence to the book and page of the record; and the then county clerk testifies that he believes this signed indorsement, as well as the full unsigned certificate mentioned, to be in the handwriting of a person named, who was, according to the clerk's recollection, deputy clerk at that time.[2]   This we are disposed to think a full compliance with the statute.   The memorandum itself contains, in substance, a certificate of acknowledgment.   The deputy clerk had the right to sign his principal's name, not only to the certificate of acknowledgment, but to the memorandum, and the fact that he failed to show that the signing was by deputy does not invalidate.   Carroll's Ky. Stat. §§ 514, 515;  Talbott's Devisees v. Hooser, 12 Bush (Ky.) 408;  Beuley v. Curtis, 92 Ky. 505, 18 S. W. 357.   And see Humphrey's Executor v. Wade, 84 Ky. 391, 1 S. W. 648.   The grantees should not be held responsible for such irregularity, if any, as there may have been.   This entire question, however, seems immaterial, if, as later held, the possession of Alfred and Thomas Eversole and their grantees was notice to Trigg, trustee, of their rights.

We also think the public record constructive notice of the deeds from Thomas Eversole and Combs, respectively, to William Newberry as of April 7, 1887.   Both deeds were executed and lodged for record 16 days earlier than the date of the deed under which Trigg, trustee, claims.   Both deeds must be deemed to have been recorded on the day they were lodged for record, viz. April 7, 1887, notwithstanding the full certificate of record bears date 18 days later.   The statute makes the record operative from the date the instrument is "lodged for record."   Carroll's Ky. Stat. 1903, §§ 496, 497.   The acknowledgment of the grantors is sufficient under section 507 (1), although it fails to state an examination of the wife separate and apart from the husband. Dowell v. Mitchell, 82 Ky. 47.

The fact that the signature to the certificate of acknowledgment and record, indorsed on the Eversole deed, is not in the handwriting of the then clerk, is not, in our opinion, fatal.   The then register of deeds thinks he had a special deputy on that occasion, and says he sometimes recorded deeds for the clerk, and the statute permits the deputy, not only to write the certificate, but to take acknowledgments.   Carroll's Ky. Stat. §§ 514, 515;  Talbott's Devisees v. Hooser, supra;  Beuley v. Curtis, supra.

The indorsement on the Combs deed is in the handwriting of the then clerk.   It was the practice to indorse on the back of the deed the date of acknowledgment and record by way of memorandum, and from that later to extend the certificate covering the acknowledgment.   Such practice, in case the original memorandum is made by the deputy, is expressly authorized by statute (sections 514, 515);  and, in view of the authorities above cited, there seems no reason to question the ex-

---

[2] The memorandum referred to reads as follows:  "Acknowledged before me by W. G. Eversole and Jane Eversole, and lodged for record and recorded in deed [giving description and page], this 5th day of February, 1878. Ira J. Davidson, C. P. C. C.;"  the initials evidently meaning "Clerk Perry County Court."

istence of as full a power where the clerk himself makes the original memorandum.

In our opinion, Trigg, trustee, must be held to have had constructive notice of the rights of Thomas and Alfred Eversole (and of Newberry, as to his part) at the time he took the mineral deed from Combs and Baker on July 21, 1887, notwithstanding the title bond from Combs to the Eversoles was not entitled to record, and so was not constructive notice. Newberry was then in possession of his part of the land under conveyance from both Eversole and Combs, and claiming title to both surface and minerals. Both Thomas and Alfred were then in actual possession of the remainder, and had for many years been in such possession and claiming title, respectively, to the entire of the two tracts, both surface and minerals, covered by their deeds from their father, and subject only to Combs' lien for a few hundred dollars, occupying residences thereon and making and working substantial clearings. The effect of their possession upon the question of notice is, in our opinion, no less than would be applied to a defense of adverse possession. In such case the public notice given by possession would not be affected by actual defect in the record of their deeds, for it was unnecessary that they be recorded at all. Mosley v. Kentucky Lands Co. (C. C. A. 6) 259 Fed. 106, 109, 111, 113, —— C. C. A. ——.

Nor was the effect of their constructive possession as notice of their claims necessarily limited to the land actually inclosed or worked, or covered by their home buildings, inasmuch as their deeds described the land by natural boundaries, and the record indicates that such descriptions were sufficient to enable a surveyor to locate the boundaries upon the ground. Mosley v. Ky. Lands Co., supra, 259 Fed. 132, —— C. C. A. ——. There having been no actual possession of the Combs tract within the overlap (nobody seems ever to have lived on that tract), the notice of claim afforded by the possession of the Eversoles under their title deed extended to all the lands described therein. Mosley v. Ky. Lands Co., supra; Mineral Development Co. v. Ky. Coal Lands Co. (C. C. A. 6) 259 Fed. 118, 124, 125, —— C. C. A. ——; Rowe v. Kidd (C. C. A. 6) 259 Fed. 127, 130, —— C. C. A. ——. Newberry had a good title. This is especially true in view of the fact that such possession was accompanied by title bonds from Combs, and even though the possession so had did not amount to an adverse possession as against Combs. We therefore think it clear that the possession of Alfred Eversole, Thomas Eversole, and William Newberry was in equity notice to Trigg, trustee, of whatever their actual rights were.

The circumstances under which the deed to Trigg, trustee, was taken are also pertinent. The contracts for the mineral rights which passed to Trigg, trustee, were all taken by one Horsley, who about June, 1887, made a contract with Trigg, trustee, for the purchase of mineral rights to the extent of 100,000 acres. Horsley had a number of agents buying on commission, including one French, who bought the minerals under the Baker tract some time previous to July 21, 1887, on which date conveyance was made by Combs and Baker to Trigg, trustee, at a meeting at Hazard, Ky., attended by Horsley, French, and one Judge Wells, who represented Trigg, trustee, in paying for the titles. There

was a large number of people present, presumably in large part those from whom options had been taken and who were to make then and there their conveyances thereunder. Horsley had also taken mineral contract with Alfred Eversole on June 18, 1887 (before the latter's conveyance to Cornet), and for the purpose of turning it over to Trigg, trustee. There is evidence on the part of French, Horsley, and Wells tending to show the existence, at the meeting of July 21st, of more or less question about Combs' title. Abstracting was difficult, and Wells said he had no time to get abstracts, and apparently was paying so little for the mineral rights that he was willing to take some chances. Horsley and French also paid little attention to the titles. The agents were working on commission, and the more acres the tracts were estimated at the more money they got. The policy seems to have been to try to have all interested in the titles get together, and then agree on who was to receive payment directly from Wells. This was practically a safe enough course, provided all interested got together and agreed; otherwise, not. Horsley says there was a controversy over the Baker title and how the money was to be divided up, and that "there were several claiming an interest in these lands." Judge Wells said he understood there had been trouble between the Frenches and the Eversoles and their followers, and thought representatives of each side were present; also that the Combs tract was not surveyed.

It seems plain that inquiry as to the Eversoles' rights and claims, as related to the Combs tract, would have brought prompt and full knowledge thereof, and that there was sufficient in the surrounding circumstances to fairly put the representatives of Trigg, trustee, on inquiry.[3]

[3] 5. We are thus brought to the question whether Thomas and Alfred Eversole did in fact "stand by," and thus mislead Trigg, trustee, into accepting the Combs and Baker conveyance in the belief that he was getting the title of Thomas and Alfred. If they did so, they and their subsequent grantee (this would not apply to the Newberry title) would be estopped from claiming the contrary, in view of the lack of record of Combs' title bond of August 31, 1883. Estep v. Kentland Coal & Coke Co. (C. C. A. 6) 239 Fed. 617, 620, 621, 152 C. C. A. 451; Virginia Iron, C. & C. Co. v. Campbell, 105 S. W. 129.

As to Thomas Eversole, there is no convincing basis for that claim. It is undisputed that Thomas was at the time living in another county; he testifies (evidently in open court) that he was not at Hazard during the year in question, and there is other evidence in corroboration of his testimony.

It remains to consider whether Alfred was present and participating in the sale by Combs and Baker. Upon this proposition plaintiff manifestly carries a heavy burden of proof. The testimony offered in sup-

---

[3] After July 21, 1887, Trigg, trustee, seems to have gotten Horsley to release him from all above 60,000 acres, with promise to help sell the remaining 40,000 acres, which would include Alfred Eversole's mineral contract previously taken. Horsley then made a deal with Bright, trustee. It is through this latter relation that the Bright, trustee, conveyances (under which defendants claim) were made, the options from Newberry and Thomas Eversole having been taken September 3, 1887.

port of it is substantially that of French, Wells, Horsley, and W. J. Combs, son of J. H. Combs; the latter and Baker both being dead at the time of the trial. French throws no light on the subject. He had "no personal recollection relative to the buying of minerals from J. H. Combs and William Baker and the conveyance of them to T. P. Trigg," although his book would indicate that he or some of his agents bought the mineral from Baker (at what precise date does not appear), and it is conceded that French was present when the sale to Trigg, trustee, was consummated on July 21, 1887. Wells, who acted as paymaster and passed upon the titles, says that he is unable to "recall whether any Eversole was present." He remembers "meeting several Mr. Eversoles." The most definite thing he can say is that he "paid the money, as was agreed, to Mr. Combs, made it satisfactory with the parties present, and then accepted the conveyance from Combs and Baker to Trigg, trustee."

The testimony of Horsley, on which plaintiff specially relies, is not convincing. The strongest statement he makes is that "when old man Combs came in, there was some question about his titles, and there was a Mr. Eversole with him. That gentleman was a red-complected man, who wore his shirt unbuttoned. * * * I did not remember positively about this man until afterwards. I believe, from what I have found out since, that it was Alfred Eversole." He states no satisfactory reason for so believing. There were a great many Eversoles in the neighborhood, and a number of that name were present at the meeting. His only attempted personal identification of the Eversole he refers to is that he (Horsley) had some Eversole acting as agent for him, and that "the Eversole to whom I refer as being present on July 21, 1887, when Josiah H. Combs and William Baker were there, was I think one of my agents, to whom a commission was paid." He also says "there was some division of the money in some way, and I think the money was paid to Mr. Eversole under his contract. I think the money went to Mr. Eversole for the profits." He does not say that the agent who acted for him was Alfred. Although he or one of his agents had taken the mineral option from Alfred Eversole only about a month before the conveyance from Combs and Baker, he seems not to have had the fact in mind, nor did his recollection seem refreshed by reference to that fact as contained in the deed from Eversole to Bright, trustee, made in pursuance of the option.

Clearly, title to real estate should not be divested by so indefinite an identification, both of person and of fact, attempted 33 years after the event. The testimony of W. J. Combs is too uncertain and contradictory to justify placing substantial reliance upon it. He first testified, on plaintiff's behalf, that both Alfred and Thomas Eversole were present at the meeting in 1887, when the deed from Combs and Baker to Trigg, trustee, was delivered, describing Alfred as having a red head; that an arrangement was there made by which Thomas and Alfred, respectively, were to get the land, and Combs to get the mineral and the pay for it, and that the father later gave Thomas and Alfred, respectively, deeds for the surface; also that Alfred Eversole was then living. This latter statement was incorrect; the testimony disputing

Thomas Eversole's presence has already appeared herein. As a witness for defendants, Combs testified that by the deed from Baker and Combs to Trigg, trustee, his father conveyed "what he let Bill Baker have, about 800 acres." He later made an affidavit for defendants, substantially nullifying his former testimony as a witness for plaintiff, regarding the presence of Thomas and Alfred Eversole, and their participation in the Baker-Combs conveyance to Trigg, trustee, and on rehearing testified that he thought he was present when the mineral deed was made to Trigg, but that he could not state positively whether he saw either Alfred or Thomas Eversole there, and that he knew nothing about how Alfred paid for the title bond. On cross-examination he substantially adhered to his testimony when first a witness for plaintiff. There was also testimony of a statement made by Combs during the trial that "Alfred [Eversole] paid for it [the land] in stock, and named a yellow mare and a yearling." He may have told the truth when first a witness for plaintiff; we do not intimate that he did not do so; but manifestly whether he did so or not is, under the circumstances stated, too problematical to justify reliance upon it. Judge Cochran, while not finding it necessary to determine that question, in view of his conclusion that the deed from Combs and Baker to Trigg, trustee, was not intended to convey the minerals here in question, remarked of the evidence as to Alfred's presence, and his consent or lack of objection to the payments to Combs and Baker, "it is sufficient to say that I do not think it establishes such facts."

Any presumption that the parties concerned were acquainting themselves with the existing facts, and closing up the transactions of July 21st with reference to those facts, is further discredited by the consideration that Thomas Eversole seems to have been entirely overlooked, as well as Newberry, who but a little more than three months previously had taken full conveyance directly from Combs. There is no force in the fact that Alfred Eversole did not dispute the testimony relied upon to show his presence. The testimony in question (on the open court hearing) was taken in October, 1914. Alfred's deposition had been taken September 17, 1912, and his attention was not directed to that subject; indeed, it was not until September 30, 1913, that plaintiff set up the claim that Thomas and Alfred were present, and made the alleged representations as to the right of Baker and Combs to convey the minerals, on which the asserted estoppel is based. At the time of the open court hearing, when Wells, Horsley, and W. J. Combs were sworn, Alfred was dead. This fact not only appears by the testimony of Thomas Eversole, but in the answer of the Virginia Iron, Coal & Coke Company, filed September 30, 1913, to the bill of Alfred Eversole's heirs, it is expressly denied that Alfred was living when that suit was begun, which was June 25, 1913.

Upon a careful consideration of the entire record, and taking into account all the arguments to the contrary, we are of opinion that plaintiff has not sustained the heavy burden of proof to which we referred in the early part of this subdivision.

6. Appellants make a special claim to the minerals underlying the lands on the left-hand fork of Buffalo creek, resulting from this situa-

tion: It appears from the testimony of Thomas Eversole that there was some land at the upper end of the creek not covered by the deed from Woolery G. Eversole to Thomas, the latter's only title thereto being through Combs; that Thomas did not sell this land to Newberry, and did not himself sell any minerals, except so far as he joined in Newberry's conveyance to Bright, trustee; and that since the purchase by Trigg, trustee, under the Combs and Baker deed, Thomas procured conveyance of the land referred to. The assumption seems to be that Thomas Eversole's rights previous to the acquisition by Trigg, trustee, being based entirely upon the Combs title bond, and he not being in possession when the deed to Trigg, trustee, was made, the latter's title is superior. Unless the land referred to by Thomas is the land appellant designates as on the left-hand fork, there seems nothing to consider in this respect. But, assuming that Thomas Eversole and appellant are referring to the same land, appellant's claim to a special equity therein is not at all clear. The alleged deed from Combs to Thomas Eversole is not in the record, nor do we find any sufficient description of the lands claimed by appellant to be covered by that deed. Appellees say in their brief that Bright, trustee, makes no claim to the lands at the upper end of the Buffalo fork, and it would thus seem that the real controversy is between Trigg, trustee, and Thomas Eversole. The latter, however, is not a party to the suit. In this state of the record appellant's contention seems too hazy to justify special consideration of this part of the tract.

The conclusion we have reached makes it unnecessary to consider the question of title by adverse possession. Nor have we thought it necessary to discuss all the various propositions discussed by counsel, although we have considered them all.

It results, from the views we have expressed, that, in our opinion, the decree below was right, and should be affirmed, with costs.